434 F.2d 301
 FAN WAN KEUNG, Chau Siu Pong, Au Ming, Cheng Sui Wa, Tam
Pang Him, Ip Shu Wah, Man Loi Hing, Chau Yau Fuk,
Wong Tat Kwong, Wu On Cheong, Petitioners,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 Nos. 821-830, Dockets 33844, 33920, 34060, 34064-34066,
34137, 34343, 34614, 34657.
 United States Court of Appeals, Second Circuit.
 Argued May 26, 1970.
Decided Oct. 19, 1970.
 
 Anthony E. Anzalone, Stuart Wadler, New York City, for petitioners Fan Wan Keung, Chau Siu Pong, Cheng Sui Wa, Tam Pang Him, Ip Shu Wah, Wu On Cheong.
 Thomas Church, New York City, for petitioners Man Loi Hing, Chau Yau Fuk.
 Jules Coven, New York City, for petitioners Au Ming, Wong Tat Kwong.
 T. Gorman Reilly, Asst. U.S. Atty., Stanley H. Wallenstein, Gen. Atty., INS, Whitney North Seymour, Jr., U.S. Atty., for respondent.
 Before WATERMAN and FRIENDLY, Circuit Judges, and ZAMPANO, District Judge.*
 WATERMAN, Circuit Judge.
 
 
 1
 Petitioners[1] seek review of orders of the Board of Immigration Appeals denying their several motions in which they have requested reopening of their deportation proceedings so as to allow each of them reinstatement of voluntary departure. In each case the Service has moved to dismiss the petitions. We grant the motions to dismiss.[2] Although the facts of each case vary somewhat, the material facts in each, the facts upon which our decision is based, are sufficiently identical to warrant the consolidated treatment of all the petitions in this one opinion.
 
 
 2
 All of the petitioners are natives of China. All but Wu On Cheong, Docket No. 34657, are crewmen. Of the nine crewmen seven were permitted to enter the United States for the period of time their vessels would remain in port but not to exceed twenty-nine days. Section 252 of the Immigration and Nationality Act, 8 U.S.C. 1282. They jumped ship and stayed here illegally. The other two, Cheng Sui Wa, Docket No. 34064, and Chau Yau Fuk, Docket No. 34343, were refused any permission to land but they nevertheless unlawfully entered the country. Wu On Cheong, Docket No. 34657, was admitted to the country as a non-immigrant visitor for pleasure but was in fact excludable because he had previously been arrested and deported as an overstaying crewman and he had not applied for permission to re-enter as required by Section 212(a)(17) of the Act. 8 U.S.C. 1182(a)(17). All of petitioners are under outstanding orders of deportation and warrants of deportation have been issued in each case. In all but one of the cases, the discretionary privilege of voluntary departure had been granted by the Special Inquiry Officer at original deportation hearings because the aliens represented that they were able and willing voluntarily to leave without expense to the Government whenever required to do so. They all failed to depart and alternative orders of deportation took effect. In the remaining case, that of Cheng Sui Wa, the Special Inquiry Officer did not grant voluntary departure as a matter of discretion.
 
 
 3
 Five of the petitioners here presented their motions to the Board of Immigration Appeals which had original jurisdiction under 8 C.F.R. 3.2. All of the motions were denied by the Board. Four presented theirs to the Special Inquiry Officer who had original jurisdiction under 8 C.F.R. 242.22. He denied the motions and appeals taken therefrom were dismissed by the Board. Cheng Sui Wa, who had initially been denied voluntary departure, made a motion to the Board to reopen his case so that he could reapply for that privilege. This motion was denied by the Board.
 
 
 4
 We take the case of petitioner Fan Wan Keung for more particularized discussion. He was admitted as an alien crewman on February 17, 1969. Having remained longer than permitted, deportation proceedings against him were begun before a Special Inquiry Officer. During the course of these proceedings Fan Wan Keung applied for and was on April 7, 1969 granted the discretionary relief of voluntary departure. Under the terms of the grant he was given 30 days within which so to depart, but if he failed to leave within the prescribed period an order deporting him to Hong Kong would become effective.
 
 
 5
 Fan Wan Keung did not depart voluntarily within the 30-day period, as he had promised the Service he would, and the District Director issued a warrant for his deportation. On July 7, 1969, the day he was ordered to report for deportation he filed a motion before the Special Inquiry Officer to reopen his deportation proceedings so as to give him an opportunity to apply for reinstatement of voluntary departure and an extension of 60 days within which to do so.
 
 
 6
 The Special Inquiry Officer determined that the motion for reopening the deportation proceedings did not allege facts sufficient to warrant the granting of voluntary departure a second time and denied the motion, and on July 28, 1969 the Board dismissed the alien's appeal from that denial.
 
 
 7
 All of the other nine petitioners herein have managed to remain in the United States for even longer periods than Fan Wan Keung, one from 1964, one from 1966, six from 1967, and one from 1968. Among other devices used to delay deportation eight of them have resorted to the device of having a member of Congress introduce bills legalizing their entries, and, indeed, five of them have had bills introduced into two congressional sessions. Although no alien named herein has had a private bill favorably acted upon, the pendency of such a bill causes the Service, out of respect for the Congress, to delay enforcement of the deportation warrant until final action upon the bill or final adjournment.
 
 
 8
 The purposeful pattern found in all these cases, while varying slightly in immaterial respects from case to case, may be summed up in one word-- 'delay.' In no case does a petitioner seriously contest the issue of his deportability. According to the statute, and on the merits of each case, not one of these petitioners should be here in this country, yet they are still here, one since as far back as in late 1964. The delays have been accomplished by resort to every applicable procedural delaying tactic known to our system of jurisprudence. The importance to deportable alien crewmen of obtaining delays in departure is set forth by the Board of Immigration Appeals in Wong Chung Pui, an unreported decision dated August 21, 1969:
 
 
 9
 Many alien crewmen have gladly availed themselves of the privileges of voluntary departure and have proceeded abroad, there to pursue the necessary steps and spend the time needed to obtain the immigrant visa required for their return here as immigrants. Others have sought to remain here indefinitely, until such time as a visa should become available. This usually requires a fairly substantial period, since normally before a visa becomes available to aliens who are crewmen by occupation there must first be obtained the labor certification required by section 212(a)(14) of the Act; then a visa petition in the alien's behalf must be processed and approved by the District Director; and, finally, the alien's turn must be reached on the quota waiting list. Once a visa becomes available, if the alien can arrange to have his visa application entertained by an American consul in a nearby country, he can make an appointment, depart from the United States long enough to pick up the visa, and return promptly and be admitted as an immigrant for permanent residence. In this way, the crewman illegally here can achieve permanent residence with only the slightest interruption in his presence and activities here.
 
 
 10
 To reach this happy ending, the crewman must somehow manage to remain here and postpone the day of his required departure by whatever means he can until the time is ripe. Some put off the day of departure by the simple process of absconding; some by contriving frivolous and dilatory litigation; some by obtaining the introduction of private bills; some by various combinations of the foregoing.
 
 
 11
 Even after contriving to remain here until the eve of the consular appointment, however, one final boon must be sought. The outstanding deportation order must be withdrawn and voluntary departure authorized. Unless this bounty is granted, the alien's departure executes the outstanding deportation order under section 101(g) of the Act, and permission to reapply must be sought and obtained before visa eligibility can be reacquired.
 
 
 12
 To the alien crewman intent on returning here permanently, voluntary departure is thus a privilege of the greatest importance.
 
 
 13
 In these present proceedings petitioners argue that due to a sudden 'about-face' in Immigration Service policy, they were denied what had in the past been freely given, a second opportunity to depart voluntarily. Under the applicable statute an alien during the course of deportation proceedings may apply for the privilege of voluntary departure. Immigration and Nationality Act, 244(e), 8 U.S.C. 1254(e). According to the Regulations, 8 C.F.R. 244.1, before the privilege may be granted by a Special Inquiry Officer, an alien must establish that 'he is willing and has the immediate means with which to depart promptly from the United States.' Also, according to 8 C.F.R. 244.1, the Special Inquiry Officer may specify the time within which the alien may so depart and, according to 8 C.F.R. 244.2, the District Director of the Service is vested with the sole jurisdiction to entertain requests to extend the time for voluntary departure that had been so granted by the Special Inquiry Officer. Apart from this regulatory base, it seems that the district director in New York had made it a practice under a procedure known as 'a nunc pro tunc extension of the expired voluntary departure time' liberally to reinstate the privilege of voluntary departure when an alien had not departed within the initial period allowed him, irrespective of what may have occurred in the interim, if the alien who had failed to depart could satisfy the district director that he was presently willing and able immediately to do so. An alien usually demonstrated his good faith by appearing before the district director with an airline ticket in hand and promising to leave the country promptly. The procedure is described in the Service's Operating Instructions, 243.1(a), as follows:
 
 
 14
 If after the expiration of the voluntary departure time granted in connection with the alternate order of deportation entered by a special inquiry officer of the Board of Immigration Appeals the alien presents a valid travel document and a confirmed reservation for transportation * * * a nunc pro tunc extension of the expired voluntary departure time may be granted.
 
 
 15
 The effect of the Service's liberal policy was to give to an alien who had been granted the privilege of voluntary departure but who had failed to depart within the prescribed time limit the reinstatement of the privilege which he had presumably 'lost' by his continued presence in this country. It is apparent that until June 1969 aliens, through the advice of their attorneys, had treated the long standing generosity of the District Director as the procedural norm and had been confident that any dilatory tactics aimed at postponing their departure date would not ultimately work an abandonment of their privilege to depart voluntarily. By June 1969, however, the Service's policy of generosity underwent a reevaluation and an abrupt change occurred in its attitude toward those who sought a reinstatement of voluntary departure, i.e., 'a nunc pro tunc extension of the expired voluntary departure time.' On July 3, 1969, the Commissioner of Immigration and Naturalization issued an amendment to 243.1(a) which reflected the District Director's new emphasis in considering 'nunc pro tunc extensions.' The amendment reads:
 
 
 16
 The provisions of this paragraph shall not ordinarily be applicable to any alien who has remained in the United States for an extended period of time by means of obviously dilatory actions in Courts or elsewhere.
 
 
 17
 This policy change was recognized and discussed in Wong Chung Pui, supra, in which it was stated:
 
 
 18
 The purpose of authorizing voluntary departure in lieu of deportation is to effect the alien's prompt departure without further trouble to the Service. Both the alien and the Service benefit thereby. But if the alien does not depart promptly, so that the Service becomes involved in further and more costly procedures by his attempts to continue his illegal stay here, the original benefit to the Service is lost. And if, after years of delay, he is again rewarded with the opportunity for voluntary departure which he has previously spurned, what incentive is there for any alien similarly circumstanced to depart promptly when first given the opportunity?
 
 
 19
 The Service's Operations Instruction (243.1(a)) apparently authorizes the nunc pro tunc extension of voluntary departure even in the cases of crewmen. We are informed that until recently this dispensation was accorded by District Directors in their discretion where they considered it appropriate. The policy has now changed, and District Directors no longer extend this privilege to crewmen, as a general proposition, who managed to remain by using obviously dilatory tactics, absent some special equities such as a close relative who is a citizen or legally resident alien.
 
 
 20
 It may seem unduly harsh to slam the door in the face of an alien who has patiently through the years blocked the Service's attempts to enforce his departure and now stands almost on the threshold of achieving his goal. Effective law enforcement may require no less, however, in circumstances such as these.
 
 
 21
 Petitioners do not claim that this change of policy in the treatment of 'nunc pro tunc extensions' is arbitrary if the change is considered to authorize prospective discretionary acts, but they do claim that the change occurred suddenly and came about without adequate notice, and therefore should not be applicable to them. Petitioners say that if they, who were in the country in June 1969 and had failed to depart voluntarily when the opportunity had first been accorded them, had been given the benefit of the liberal 'nunc pro tunc extension' policy each of them would again have received the privilege of departing voluntarily; hence, because they were not afforded reasonable notice of the change of policy and were not given a 'grace period' before the changed policy was applied to them, the refusal to reopen their deportation proceedings is an arbitrary abuse of discretion.[3] We agree that the changed policy affected some, if not all, of these petitioners,[4] but we are in no way persuaded that any of them were entitled to a 'grace period' before the change in policy was put into effect.
 
 
 22
 To begin with, the policy change of June 1969 was a return to a formerly announced policy which it appears was not continually followed by the District Director. In Matter of M, 4 I & N Dec. 626, 628 (1952), it was stated:
 
 
 23
 An alien who once was granted voluntary departure and who is found here illegally, does not merit a second chance for such departure in the absence of very strong extenuating circumstances.
 
 
 24
 If an alien, after apprehension in deportation proceedings and prior to the hearing in the deportation case, has been given an opportunity to depart voluntarily within a reasonable time, usually at least 30 days, he does not merit a further grant of departure by the hearing officer unless he gives good and sufficient reasons why he did not or could not depart when granted that opportunity. Likewise, if voluntary departure is granted by the hearing officer at the hearing, or if at that hearing the alien makes it clear he does not wish voluntary departure within a reasonable time, this Board will not grant voluntary departure in the absence of very strong and persuasive reasons to support contrary action. The purpose of this limitation is apparent. An alien should not be permitted to prolong his illegal presence in this country by failure to apply for or accept voluntary departure until he has brought his case, through various procedural steps, to the last authority where such relief may be granted.
 
 
 25
 See also Gil v. Del Guercio, 246 F.2d 553, 556 (9 Cir.), cert. denied, 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957); United States ex rel. Ling Shing v. Esperdy, 305 F.Supp. 1106, 1108 (S.D.N.Y.1969).
 
 
 26
 The need for the change is self-evident. The practice of granting the privilege of voluntary departure within a stated period had become a meaningless ritual; the granting of a 'nunc pro tunc extension' was bound to follow the initial grant as a matter of course. Therefore there was no incentive for an alien to live up to his part of the voluntary departure bargain; and the informal practice, thought of as encouraging aliens to be on their way out of the country without expense to the Government, encouraged aliens to extend their illegal stay within the country.
 
 
 27
 Of course those aliens who applied for 'nunc pro tunc extensions' after June 1969 have been denied a relief that many of their predecessors had almost routinely received, but we agree with the Government that this situation does not make the petitions of these petitioners meritorious.
 
 
 28
 The justification for whatever reliance petitioners may have placed on the old policy of liberality, a reliance which stemmed from their attorneys' advice that they could expect liberal treatment, must be determined in the light of the nature of the discretionary relief petitioners hoped to receive. The practice of freely granting 'nunc pro tunc extensions' was, as previously stated, thought to avoid the expense and formality of deportation and was believed to have the effect of hastening the departure of deportable aliens. It must have been perfectly clear to immigration attorneys that their clients were receiving gratuitous relief they legally were not entitled to, absent 'very strong extenuating circumstances.' Matter of M, supra. They also should have envisioned that this informal gratuitous practice might prove unworkable if utilized to delay, rather than to accelerate, departure, and that the Service then would necessarily return to the practice of exercising discretion in cases where an alien sought a second chance to depart voluntarily, and that a major factor in the exercise of discretion would be whether deportable aliens were using the grant to further dilatory tactics. Thus reliance, if any, on the Service's policy of liberality should have been qualified to the extent that there was always the possibility that the Service's attitude might shift toward strictness and that each motion to reinstate voluntary departure might be decided on its particular merits.
 
 
 29
 We, therefore, grant the Government's motions to dismiss.
 
 
 
 *
 Of the District of Connecticut, sitting by designation
 
 
 [1]
 By stipulation of all the parties the several government motions to dismiss the several petitions for review were argued at the same time. Although the petitions were not formally consolidated into one docket they were argued as if they had been, and it was understood that all the petitions could be adjudicated in one opinion
 
 
 [2]
 The Government alleged in its motions to dismiss each of these petitions that the petitions were frivolous. In support of its position it pointed out that two cases, Chim Ping v. INS, docket No. 33969, and Lam Kam Chi v. INS, docket No. 34207, in which oral arguments were heard by this court on January 13, 1970 and March 11, 1970, respectively, are indistinguishable from the cases at bar, and that those petitions for review had been, without opinion, dismissed as meritless from the bench at the conclusion of the oral arguments. See footnote 3 for an explanation of the Government's claim that this court has no jurisdiction to entertain the petitions
 We have thought it better, however, to treat the petitions here as having a color of validity and as deserving discussion on their merits.
 
 
 [3]
 The Government claims that petitioners should have attacked the Service's change in policy relative to 'nunc pro tunc extensions' in the federal district court rather than by the motions they made to reopen deportation proceedings before a Special Inquiry Officer. Nevertheless, we have jurisdiction to review orders refusing to reopen deportation proceedings, Giova v. Rosenberg, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964), and we view the Service's change of policy as having a bearing on the exercise of a Special Inquiry Officer's discretion in passing upon an application to reinstate the privilege of voluntary departure. Inasmuch as, in substance, a 'nunc pro tunc extension' of voluntary departure and a reinstatement of voluntary departure grant an alien the same relief, even though the request for the relief is passed upon by different officials within the Service, a Service policy directed to the exercise of a District Director's discretion is not an irrelevant policy when essentially the same relief is sought from a Special Inquiry Officer
 
 
 [4]
 For example, Chau Yau Fuk, Docket No. 34343, who had been in the United States unlawfully since July 24, 1967, had been ordered deported but had received extensions of time in which to depart voluntarily. The last extension, his fourth, permitted him to so leave the country as late as August 31, 1969. Surely a 'change of policy' in June 1969 did not affect him. However, he once again failed to depart, as permitted, and when he applied in September for a fifth extension the request was, quite understandably, denied